JURY TRIAL DEMANDED

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| DUSTIN HEFLEY<br><br>    Plaintiff,<br><br>vs.<br><br>CORIZON HEALTH, INC. and ANNE L. PRECYTHE, in her official capacity as director of the Missouri Department of Corrections<br>    Defendants. | COMPLAINT<br><br><br>Case No. |

**COMPLAINT**

Plaintiff, Dustin Hefley, through counsel, brings the following action against Defendants, Corizon Health, Inc. ("Corizon") and Anne L. Precythe (in her official capacity as director of the Missouri Department of Corrections):

**GENERAL ALLEGATIONS**

1. This action is brought for equitable relief and damages under 42 U.S.C. §§ 1983 (the Ku Klux Klan Act of 1871), 1985 and 1986 ("the Civil Rights Act") in regard to violations by defendants of rights secured to Plaintiff by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Attorney fees, costs and expert witness costs are sought pursuant to 42 U.S.C. § 1988.

2. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 in that Plaintiff has brought claims arising under federal law for violations of his constitutional rights as provided by 42 U.S.C. § 1983 and pendent state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all defendants reside in Missouri or may be found in this District and Division, and in that the events giving rise to this claim occurred within this District and Division, and specifically within Pike County, Missouri.

4. This Court has personal jurisdiction over the defendants as the defendants are residents and citizens of political subdivisions of the State of Missouri.

5. This Court also has personal jurisdiction over the non-resident defendants as they transacted business in Missouri, formed contracts in Missouri, and committed tortious acts in Missouri.

6. At all times relevant to this petition, Plaintiff was a resident of Pike County, Missouri.

7. Defendant, Anne L. Precythe, is the director of the Missouri Department of Corrections ("DOC") and at all times relevant herein was acting in that capacity.

8. Plaintiff brings his claims against Ms. Precythe in her official capacity only.

9. Defendant Precythe, as director of the DOC, at all times pertinent to this petition, had authority for and was directly responsible for, among other duties:

    a. The operation of the DOC correctional facilities, including the Northeast Correctional Center ("NECC"), and for the control, housing and treatment of all persons who are committed, whether post-arrest, pending trial or after trial and sentencing, to the custody of the DOC by the courts of the State of Missouri and the operation of Missouri law;

    b. The safety, well-being, medical care and mental health needs of the inmates committed to the DOC by the State of Missouri;

    c. The establishment, dissemination and enforcement of policies and procedures related to the safety and well-being of the inmates confined within the DOC; and The arranging for professional medical care to provide medical services to the inmates confined within the JCDC;

    d. The hiring and retention of medical staff or otherwise arranging for professional medical care to provide medical services to the inmates confined at DOC facilities, including Plaintiff; and

    e. The assignment and classification of inmates.

10. Defendant Precythe, as director of the DOC, is required to, and in fact did, promulgate and approve policies and procedures that governed and regulated the operation of the DOC facilities, including NECC.

11. At all times relevant to this complaint, Defendant Precythe, as director of the DOC, was required to promulgate and approve policies and procedures that governed and regulated the supervision of and medical care provided to inmates incarcerated in the DOC system.

12. During Defendant Precythe's time as director of DOC, DOC was party to a contract with a medical services provider, Defendant Corizon, under which Corizon agreed to provide medical care to the inmates incarcerated in correctional facilities operated by DOC.

13. DOC agreed to pay Corizon for medical services it provided DOC inmates, including Plaintiff.

14. In connection with the medical services it provided DOC inmates, Corizon promulgated policies and procedures related to medical treatment provide to DOC inmates.

15. As a result of DOC's delegation of policy-making authority to Corizon the policies of Corizon became the official policies of DOC.

16. Because Corizon was responsible for fulfilling Defendants' non-delegable duty to provide necessary medical care to its inmates, the actions of Corizon were done under color of law.

17. Plaintiff has exhausted his administrative remedies with respect to the claims raised in this complaint.

*Scabies Infestation*

18. At all times relevant to this complaint, Plaintiff was incarcerated at NECC.

19. Mr. Hefley was booked into NECC on or about August 28, 2017.

20. At that time, he informed NECC staff that he had a rash on his hands and midsection.

21. Two days later, Dr. Whitlock saw Mr. Hefley for what Dr. Whitlock stated was eczema caused by a soap or detergent allergy.

22. Mr. Hefley continued to complain of the rash and itching until October 16, 2017 when he saw Nurse Selsor. At that visit, Ms. Selsor noted the presence of a generalized rash over most of Mr. Hefley's body.

23. Two weeks later at an appointment to follow up on Mr. Hefley's previous cancer diagnosis, Dr. Miguel Paniagua observed Mr. Hefley's skin condition and diagnosed him with a pruritic erythematous rash, but did not identify the cause of the rash.

24. In fact, between Mr. Hefley's booking at NECC in August 2017 until October 31, 2019, multiple doctors and nurses at NECC saw Mr. Hefley and misdiagnosed his skin condition. These misdiagnoses included, but were not limited to the following:

a. Dr. Whitlock believed that Mr. Hefley's rash was contact dermatitis from laundry detergent (12/8/17)

b. Dr. Michael Hakala believed the rash was stress-related (2/26/18)

c. Teresa Burrell, a nurse, noted that Mr. Hefley was suffering from altered skin integrity (3/8/18)

d. Eric Lotter, also a nurse, noted that Mr. Hefley suffered from eczema (7/7/18)

e. While consulting with Dr. Karen Rhodes, Mr. Hefley was diagnosed with folliculitis, despite the fact that no physical exam was performed (7/17/18)

f. Dr. Rhodes also diagnosed Mr. Hefley with an uncontrolled allergy due to wash soap (9/7/18)

g. Nurse practitioner, Tamra Crouch, diagnosed Mr. Hefley with urticaria (10/12/18)

h. Dr. Jeffrey McCollum diagnosed Mr. Hefley with itching folliculitis (11/7/18)

i. Dr. McCollum later stated that he believed that anxiety played a large role, the majority role, or the causative role in Mr. Hefley's puritis (11/21/18)

j. Dr. Robert Schaaf diagnosed Mr. Hefley with lichen simplex chronicus (1/1/19)

k. Dr. Samang Kim diagnosed Mr. Hefley with impetigo (3/4/19)

l. Dr. McCollum changed his diagnosis to Lichen Planus Simplex (3/6/19)

m. Dr. Joulle Stevenson diagnosed Mr. Hefley with atopic dermatitis (10/31/19)

25. On August 26, 2019, more than two years after Mr. Hefley first complained of a rash and after his two dermatology referral requests (11/27/18 and 2/28/19) were denied, Dr. Jerry Lovelace referred Mr. Hefley for a dermatology consultation.

26. Mr. Hefley saw Dr. Robyn McCullem at the Jefferson City Medical Group on September 20, 2019.

27. Dr. McCullem immediately diagnosed Mr. Hefley with scabies.

28. Using a dermatoscope, Dr. McCullem observed multiple burrows in Mr. Hefley's flesh.

29. She also observed eggs on a mineral oil scraping.

30. Even though Dr. McCullem properly diagnosed Mr. Hefley with scabies and Mr. Hefley was able to begin treatment, his symptoms continued.

31. On November 2, 2019, Mr. Hefley saw Nurse Slaughter who noted Mr. Hefley's complaint of a rash on his inner thigh.

32. Nurse Slaughter did not look at Mr. Hefley's leg because there was no correctional officer available for supervision.

33. She did note that Mr. Hefley described the area as long, streaking purple lines similar to stretch marks, but were very deep and caused a constant, burning sensation.

34. Despite ongoing complaints by Mr. Hefley, this visit with Nurse Slaughter was the sole follow up appointment that Mr. Hefley had following his dermatology referral appointment with Dr. McCullem.

35. Appointments with Dr. Joulle Stevenson were cancelled on November 7, 2019, November 26, 2019, December 3, 2019, and December 11, 2019.

36. On January 15, 2020, Mr. Hefley saw Dr. Stevenson, who stated that she had spoken with Dr. Lovelace and that Mr. Hefley would receive another round of Ivermectin, but declined to prescribe any Permethrin.

37. This approach was destined to fail as the Ivermectin alone is insufficient to address scabies.

38. Furthermore, DOC staff failed to take additional prophylactic steps to stop the scabies infestation like providing laundry service or treating Mr. Hefley's cellmate for scabies.

39. At the end of January 2020, medical staff stopped giving Mr. Hefley Gabapentin and Benadryl.

40. While the Gabapentin was ultimately renewed, Mr. Hefley did not receive any Benadryl until February 18.

41. By that time, Mr. Hefley had gone 18 days without it.

42. Additionally, Mr. Hefley did not receive his Permethrin treatment.

43. On April 8, 2020 Mr. Hefley saw Nurse Crouch again and complained that he continued to feel like bugs were crawling under his skin and around his eyes, mouth, and nose.

44. Nurse Crouch once again asked if Mr. Hefley had spoken with mental health.

45. Mr. Hefley advised Nurse Crouch that it was mental health that encouraged him to speak with the medical department.

46. Since Mr. Hefley first complained about a skin rash and the itching associated with that rash, the medical staff tasked with treating these issues consistently prescribed topical steroids to Mr. Hefley and instructed him to use those steroids continuously.

47. Medical staff prescribed Mr. Hefley prednisone for 14 months and other topical steroids for 21 months.

### *Clavicle Fracture*

48. While still dealing with symptoms associated with the scabies outbreak, Mr. Hefley suffered a fractured clavicle on January 2, 2020 when he fell from his top bunk to the cement floor.

49. Prison staff called a Code 16 for Mr. Hefley's fall at 11:26 p.m.

50. Mr. Hefley was knocked unconscious and woke up to being placed on a backboard to be carried to the medical unit.

51. Upon arrival to the medical unit, the triage nurse, Vickie Utterback, noted swelling and pain in the area of Mr. Hefley's collar bone and shoulder, yet when Mr. Hefley begged to go to the hospital for treatment, Ms. Utterback responded, "Stop complaining. Nothing is wrong."

52. On January 14, 2020, Dr. Jerry Lovelace told Mr. Hefley's mother that Dr. Stevenson was not informed of the severity of Mr. Hefley's clavicle and rib injuries.

53. Dr. Stevenson also advised that Mr. Hefley's arm should be in a sling, that Mr. Hefley should be using an ice pack, and that Mr. Hefley should sleep in a bottom bunk for the night.

54. However, no bottom bunks were available, so correctional staff had Mr. Hefley sleep in the TCU overnight.

55. At 12:15 a.m., Mr. Hefley was admitted to the TCU rating his pain at a 9 out of 10.

56. When the doctor arrived at 7:39 a.m., she failed to examine Mr. Hefley and simply classified his status as "good."

57. No one removed Mr. Hefley's shirt to assess his clavicle injury.

58. Mr. Hefley suffered with intense pain from 11:30 p.m. the night of the fall until the late afternoon the following day.

59. The x-rays showed that Mr. Hefley suffered a broken left clavicle and two broken ribs.

60. Despite this objective evidence and continued problems with the clavicle, Defendants denied Mr. Hefley's reasonable request for an orthopedic referral on January 7, 2020.

61. Despite the fact that he went to TCU, Mr. Hefley was not provided a "lay in" for either a work stop or a wedge pillow to ensure that he would heal comfortably.

62. Instead, on January 8, 2020, a follow up x-ray was scheduled for four weeks out and Mr. Hefley's ibuprofen was increased.

63. On January 9, 2020, Dr. Lovelace noted that the clavicle fracture was a closed fracture.

64. After his initial stay in the TCU, Mr. Hefley was returned to his cell, where he was unable to sleep on the bottom bunk as Dr. Stevenson ordered.

65. Instead, he was forced to sleep on a plastic chair.

66. The pain often became so severe that he couldn't sleep.

67. After 8 days of sleeping in a plastic chair, Mr. Hefley's mother called Regina (DON) on January 7, 2020 to request that Mr. Hefley be issued a wedge pillow in order to be able to sleep in the bottom bunk as was requested by Dr. Stevenson.

68. On January 10, 2020 a second request was made by Mr. Hefley's mother with Regina for a wedge pillow and was advised this required a doctor referral and she would follow up.

69. On January 14, 2020, Dr. Lovelace advised Dustin's mother that a request had been made for the wedge pillow.

70. The wedge pillow was finally issued on January 21, 2020, 19 days after the initial injury.

71. Despite complaints that his collar bone was grinding, Defendants denied Mr. Hefley's request for an orthopedic referral on January 15, 2020.

72. On January 25, 2020, Nurse Phillips requested an additional x-ray due to Mr. Hefley's complaints of shoulder pain.

73. Mr. Hefley's mother was so desperate for her son to get medical attention that she personally spoke with Dr. Lovelace on January 28, 2020 and pleaded with him to help her son.

74. She advised Dr. Lovelace that Mr. Hefley had been sleeping on a chair for 26 days and that his whole body was in pain after trying to compensate different sleeping and sitting positions in an effort to get some pain relief.

75. Dr. Lovelace prescribed Mr. Hefley Robaxin, a muscle relaxer at this time; however, following Dr. Lovelace's conversation with Mr. Hefley's mother, Mr. Hefley was provided no

additional orthopedic treatment for his fractured clavicle until an April 1 visit with Dr. Timothy Galbraith.

76. On April 1, 2020, Mr. Hefley had an appointment with Dr. Galbraith, who diagnosed Mr. Hefley with a closed, displaced fracture of the acromial end of the left clavicle with delayed healing.

77. He determined that Mr. Hefley needed to consult with an orthopedic trauma specialist and referred Mr. Hefley to Dr. Brett Crist.

78. A consult was scheduled for May 5, 2020 with Dr. Crist; however, when he arrived for the appointment, no medical records had been sent for the appointment and only an outdated (2017) CT scan had been provided to Dr. Crist.

79. Dr. Crist did not receive the May 1, 2020 CT scan that showed left rib and clavicle fracture.

80. Dr. Crist advised Mr. Hefley that he would require extensive surgery with bone grafts, plates, and screws to heal the clavicle injury.

81. Because of COVID-19, no surgery could be scheduled.

82. Had Defendants promptly and appropriately addressed the fracture immediately after he suffered the injury, the surgery could have been completed before COVID-19 shut down orthopedic surgical procedures.

83. As a result of Defendants' delay, Mr. Hefley did not undergo surgery until July 6, 2020.

84. Dr. Crist saw Mr. Hefley again for a surgical follow up appointment on August 18, 2020.

85. At that appointment, Dr. Crist told Mr. Hefley to begin physical therapy immediately.

86. After the August 18 appointment, Mr. Hefley had only one physical therapy session, then no additional follow up.

## COUNT I—CLAIMS BROUGHT PURSUANT TO 42 U.S.C. § 1983-ALL DEFENDANTS

87. Plaintiff incorporates all preceding allegations by reference as if set out in full in this count.

88. During his incarceration, Plaintiff suffered from serious medical conditions that affected his daily activities.

89. Specifically, Plaintiff suffered from a scabies infestation and fractured clavicle and ribs.

90. Defendants knew or should have known of Plaintiff's serious medical condition.

91. Plaintiff, by virtue of his physical infirmities and status as a prisoner within the DOC, was completely and totally dependent upon Defendants to provide for his physical health needs.

92. Plaintiff's constitutional right to adequate medical care and treatment was clearly established at the time of his incarceration in DOC.

93. Plaintiff's right to medical treatment was clearly established, and Defendants did know or should have known of this right.

94. Defendants repeatedly and purposefully ignored Plaintiff's need for medical services.

95. Alternatively, Defendant turned a blind eye to the deprivations of Plaintiff's constitutional rights and failed to take action to correct said deprivations.

96. On information and belief, Defendants affirmatively sanctioned the deprivations of Plaintiff's constitutional rights by implementing official policies which directly caused the deprivations complained of herein.

97. By so doing, Defendants were deliberately indifferent to Plaintiff's constitutional rights, and Plaintiff's serious medical needs.

98. The repeated decision not to provide Plaintiff with adequate and necessary medical treatment was made pursuant to Defendants' official policies and practices as outlined herein.

99. Defendants' deliberate indifference to Plaintiff's serious medical needs constituted the unnecessary and wanton infliction of pain.

100. As a result of the actions and omissions of Defendant, Plaintiff suffered damages and injuries including assault, battery, abuse, cruel and unusual punishment, denial of proper and adequate medical care, pain and suffering, mental and emotional pain and anguish, and other violations by Defendant of rights secured to Plaintiff by the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and the Missouri Constitution.

101. Defendants failed to promulgate adequate policies, practices, and procedures regarding medical care for prisoners so as to prevent the deprivation of civil rights complained of herein.

102. Throughout the relevant time period, Defendants had the responsibility and obligation to supervise and control the acts of the guards, matrons, deputies, medical personnel and all staff and other agents in connection with DOC; however, failed to do so.

103. The cruel and unusual punishment and other constitutional violations inflicted upon Plaintiff were and are persistent and widespread practices of Defendants, and their employees, and such practices are and were so common and well-settled as to constitute a custom representing official policy on the part of Defendant.

104. The actions and omissions of Defendants were committed under color of state law and pursuant to policies, practices and procedures used with respect to the handling of prisoners held or processed at DOC.

105. The actions and omissions of Defendants constitute a violation of the Civil Rights Act, 42 U.S.C. § 1983 et seq., and Plaintiff is therefore entitled to equitable relief, damages, and

the recovery of litigation costs, including reasonable attorney fees and expert witness fees pursuant to § 1988.

106. As a direct and proximate result of the custom, practice, actions and omissions of Defendants, Plaintiff was deprived of his civil rights and liberties in violation of the Constitution of the United States, the Constitution of the State of Missouri, and 42 U.S.C. § 1983 et seq., in that Plaintiff was:

   a. Deprived of his right to be secure in his person, papers and effects;

   b. Deprived of his right to personal safety and freedom from excessive force and cruel and unusual punishment;

   c. Deprived of his right to adequate medical care;

   d. Deprived of his right to substantive and procedural due process at law;

   e. Effectively punished by Defendants in excess of any punishment properly ordered by a court of law; and

   f. Deprived of his right to privileges and immunities of the law.

107. Defendants' actions as described above were evil, willful, malicious and in conscious disregard to Plaintiff's rights justifying an award of punitive damages.

108. An award of punitive damages would serve to punish Defendants and to deter Defendants and others from engaging in similar conduct in the future.

109. Plaintiff specifically prays for punitive damages.

## COUNT II-NEGLIGENCE-CORIZON

110. Plaintiff incorporates all preceding allegations by reference as if set out in full in this count.

111. This court has supplemental jurisdiction of this state law claim under 28 U.S.C. § 1367 in that this claim is so related to the federal question claims as to form part of the same case or controversy under Article III of the U.S. Constitution.

112. At all times relevant to this complaint, Defendant Corizon acted by and through its agents and employees.

113. The negligent acts and omissions of Defendant Corizon's employees set forth more fully in this complaint occurred in the course and scope of their employment with Defendant Corizon.

114. Accordingly, Defendant Corizon is vicariously liable for its employees' and agents' negligent act and omissions.

115. Defendant Corizon and its employees and agents owed Mr. Hefley a duty:

   a. To provide an adequate number of health care providers with sufficient knowledge, experience, and training to meet his health care needs;

   b. To provide Mr. Hefley with medical care;

   c. To provide Mr. Hefley medical care in a timely fashion;

   d. To properly diagnose and treat Mr. Hefley's serious medical conditions;

   e. To refer Mr. Hefley to appropriate specialists;

   f. To not be deliberately indifferent to Mr. Hefley's health care needs;

   g. To provide an adequate initial medical and mental health screening upon Mr. Hefley's entering DOC;

   h. To provide Mr. Hefley access to necessary medical treatment;

    i. To respond to Mr. Hefley's serious medical emergencies;

    j. To promulgate policies and procedures regarding the medical care prisoners to ensure that they receive such medical care as is reasonable and necessary;

    k. To ensure that DOC medical personnel were adequately trained and equipped to diagnose and treat inmates' medical conditions, including those suffered by Plaintiff;

    l. To ensure that Mr. Hefley received prescription medication necessary to treat his serious medical conditions;

    m. To ensure that Mr. Hefley received prescription medication in such a way as to minimize the risk of adverse side effects and to maximize the efficacy of the prescription medication;

    n. To ensure that Mr. Hefley received prescription medication in a manner consistent with the applicable standard of care;

    o. To be aware of Mr. Hefley's individualized medical needs;

    p. To ensure that Mr. Hefley's medical treatment was performed in a manner consistent with Mr. Hefley's individualized medical needs;

    q. To ensure that, in all respects, Mr. Hefley's medical care satisfied the applicable standard of care; and

    r. To use reasonable care in the performance of its duties in provided medical care to Plaintiff and other inmates at DOC.

116. Defendant Corizon breached its duties to Mr. Hefley and was negligent.

117. The negligent acts and omissions of Defendant Corizon and its agents and employees included, but was not limited to:

a. Failing to timely diagnose Mr. Hefley's scabies infestation;

b. Failing to appropriately treat Mr. Hefley's scabies infestation;

c. Incorrectly diagnosing Mr. Hefley's scabies infestation multiple times;

d. Failing to refer Mr. Hefley to a dermatologist or other specialist to diagnose and treat his skin condition;

e. Failing to train its employees and agents to diagnose and treat Mr. Hefley's scabies infestation;

f. Prescribing Mr. Hefley the wrong medication to treat his scabies infestation;

g. Failing to prescribe Mr. Hefley with the correct medication to treat his scabies infestation;

h. Allowing Mr. Hefley to continue using topical steroids continuously for more than 21 months;

i. Failing to appropriately treat Mr. Hefley's scabies infestation after Mr. Hefley saw Dr. McCullem;

j. Failing to provide Mr. Hefley with treatment for the scabies infestation that satisfied the applicable standard of care;

k. Failing to appropriately diagnose the nature and extent of Mr. Hefley's clavicle and rib fractures;

l. Failing to appropriately treat Mr. Hefley's clavicle and rib fractures;

m. Forcing Mr. Hefley to sleep in a plastic chair for weeks after he suffered his clavicle and rib fractures;

n. Failing to timely provide Mr. Hefley with a wedge pillow;

o. Failing to timely refer Mr. Hefley to an orthopedic specialist after suffering his clavicle and rib fractures;

p. Misdiagnosing the nature and extent of Mr. Hefley's clavicle and rib fractures;

q. Failing to appropriately respond to Mr. Hefley's continued complaints of pain caused by the clavicle and rib fractures;

r. Failing to provide Mr. Hefley with treatment for his clavicle and rib fractures that satisfied the applicable standard of care; and

s. Failing to provide Mr. Hefley with post-surgical treatment and care, including but not limited to physical therapy; and

t. Failed to use that degree of care that careful and prudent physicians and other medical professionals would use under the same or similar circumstances.

118. As a direct and proximate result of Defendant Corizon's multiple negligent acts and omissions, Mr. Hefley suffered injuries including, but not limited to economic and non-economic damages in amounts to be determined at trial.

119. Defendant Corizon's actions as set forth above were wanton, reckless, evil, and in conscious disregard to the rights of Mr. Hefley and an award of punitive damages would serve to punish Defendant Corizon and to deter Defendant Corizon and others from engaging in similar conduct in the future.

## COUNT III-NEGLIGENT SUPERVISION-CORIZON

120. Plaintiff incorporates all preceding allegations by reference as if set out in full in this count.

121. At all times relevant to this complaint, Defendant Corizon provided physician care, physician services, diagnosis, treatment, and other necessary medical services for prisoners at DOC, including Plaintiff.

122. Defendant Corizon provided such care pursuant to a contract with DOC.

123. Defendant Corizon provided such care through physicians and other medical professionals affiliated with or employed by Defendant Corizon.

124. As described more fully in Count II above, these physicians and other medical professionals breached the duties they owed Mr. Hefley and were thereby negligent.

125. The negligent acts of Defendant Corizon's agents and employees directly and proximately caused Mr. Hefley to suffer economic and non-economic damages.

126. Defendant Corizon knew, or by the use of reasonable care should have known, of the negligent acts and omissions of its agents and employees.

127. Defendant Corizon failed to use ordinary care to supervise its agents and employees in the performance of their duties with respect to the diagnosis and treatment of Mr. Hefley's scabies infestation and fractured ribs and clavicle.

128. As a direct and proximate result of Defendant Corizon's failure to supervise its agents and employees, Mr. Hefley suffered injuries and damages in amounts to be proven at trial.

### **Prayer for Relief**

**WHEREFORE**, Plaintiff prays this Court enter judgment in favor of Plaintiff and against Defendants for actual damages, compensatory damages, and punitive damages in an amount to be determined by a jury as fair and reasonable, award Plaintiff his reasonable attorney fees and costs, and award Plaintiff such other relief as the Court deems just and proper.

## **Jury Demand**

Plaintiff demands a trial by jury on all issues so triable.

Date: August 23, 2021

By */s/Nathan A. Duncan*
Nathan A. Duncan (Mo. Bar #60186)
PECK HADFIELD BAXTER & MOORE, LLC
nduncan@peckhadfield.com
399 North Main, Suite 300
Logan, Utah 84321
Telephone: (435)787-9700
Facsimile: (435)787-2455
*Attorney for Plaintiff*